UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

MICHAEL H.[1],                         )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        CIVIL NO. 2:20cv232
                                       )
ANDREW M. SAUL,                        )
Commissioner of Social Security,       )
                                       )
        Defendant.                     )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) as provided for in the Social Security Act. Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12

_____

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings."  *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law."  *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.      The claimant has not engaged in substantial gainful activity since June 20, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: status-post lumbar laminectomy and fusion; status-post cervical laminectomy and fusion; degenerative disc disease with radiculopathy; and right median neuropathy (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance and stoop; and never kneel, crouch, or crawl.  He could tolerate occasional exposure to extreme cold, hazards such as moving mechanical parts and unprotected heights, and wet, slippery, or uneven walking surfaces.  He requires a cane for ambulating greater than 100 feet, but his contralateral hand could be used for lifting and carrying up to the exertional limit.  With the bilateral upper extremities, he could frequently reach forward, occasionally reach overhead, and frequently handle.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on December 12, 1971 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 404.1569 and 404.1568a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 20, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-26).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on December 28, 2020.  On January 25, 2021 the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on February 18, 2021.  Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled.  *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"?  (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

4

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

Plaintiff has a history of cervical, lumbar and thoracic pain (Tr. 1024, 1027, 1032, 1039), for which he engaged in pain management in 2014 and received cervical epidural injections, facet injections to the cervical and thoracic spine and nerve blocks. (Tr. 882-905). He also treated for extensor carpi ulnaris tendinosis and mild to moderate first carpometacarpal arthritis. (Tr. 990, 1044). In 2015, Plaintiff received injections and radiofrequency ablations along with medications such as Percocet, Lyrica and Medrol. (Tr. 325). Due to ongoing pain, in August 2015, Plaintiff underwent an anterior cervical discectomy and fusion at C5-7 (Tr. 350, 474-94) and then returned to the emergency room a week later due to swelling and pain to his anterior neck incision. (Tr. 495). He then participated in physical therapy. (Tr. 355). Towards the end of 2015 he was experiencing stiffness to the neck and deep pain to the right lower extremity as well as weakness to the right upper extremity. (Tr. 360).

By March 2016, Plaintiff treated for right upper extremity pain. (Tr. 364). While the surgical fusion had taken away some of the pain, he continued to have pain at the base of his skull, pressure to the occipitocervical junction, occasional numbness to the left arm, and if he was holding a hammer with his right hand, it would fall out of his hand. He also was suffering from headaches. (Tr. 364, 366, 504-05). As a MRI was not that definitive, he underwent a discogram which showed the nerve root cut off on the right at C5-6. He suffered a post-myelogram headache necessitating a blood patch. (Tr. 374, 466, 468, 507, 510-21, 570-77, 622). A lumbar MRI confirmed DDD and disc bulge at L3-4. He also complained of very severe lower back pain and weakness into the right arm. (Tr. 365, 389, 305, 524-27, 529, 638). A functional capacity

evaluation noted "no physical labor". (Tr. 407). An EMG showed medial neuropathy at the wrist and cervical radiculopathy at C6-7. (Tr. 1098).

In July 2016 Plaintiff underwent a decompression surgery at L3-5 and discectomy and fusion. (Tr. 529-61).  Dr. Joseph Kacmar assessed him pre-operatively. (Tr. 1378-82). In August 2016 Plaintiff continued to have daily spasms to the left side of his back and pain into his left hip and lower extremity. He was walking with a wheeled walker. (Tr. 651, 669). Physical therapy was started. (Tr. 417, 660). In therapy it was noted that he had good and bad days. He was sometimes able to tolerate functional activities which involved box lifts with 12.5 pounds and push/pull of the sled with 50 pounds but "he continues to have deficits with flexibility and extreme deficits noted over the bilateral hamstrings. The patient has decreased dynamic balance and decreased core stability noted with functional activities. He demonstrates gait deviations with decreased trunk and torsion and decreased stride length". (Tr. 449). In August 2016 Plaintiff also treated for varicose veins with bulging veins, cramping, fatigue, severe pain and irritation and recommendation of compression stockings and leg elevation due to edema. (Tr. 1243-50).

Between October and November 2016 Plaintiff complained of ongoing bilateral hip and lower back pain. Physical therapy was not helping as much as he would like. Plaintiff suffered from weakness with prolonged standing. (Tr. 433-34, 673, 676). A CT showed that the L3 screw was a little medialized. (R. 445, 454).

In December 2016 neurosurgeon Dr. Wayel Kaakaji listed physical observations as 4/5 left dorsiflexor weakness, severe sensory loss to the left anterior thigh, 4/5 left quad weakness and atrophy of left calf. (Tr. 720-21). Plaintiff was suffering more problems in his hips and weakness into his legs, especially with tying his shoes, getting in and out of a car and being active. (Tr. 721).

Plaintiff appeared to have left sided L3-4 radiculopathy plus hip pain with MRIs ordered. (Tr. 722). A thoracic MRI showed mild osteoarthritic changes and a cervical MRI showed post-surgical changes and a mild disc bulge at L2-3. (Tr. 734). Around this time Plaintiff received endovenous laser treatment for varicose veins. It was noted he had severe pain and cramping with recommendation to avoid long periods of standing, use compression stockings and elevate his legs. (Tr. 1225-35, 1238-39). He had medium vein disease. (Tr. 1223).

Dr. Kaakaji noted on examination that Plaintiff was unable to heel and toe walk, had poor range of motion to the lower extremities and back, atrophy of left calf, 4/5 left quad weakness and dorsiflexion weakness and severe sensory loss of the left anterior thigh. Plaintiff had ongoing severe lower back pain making it difficult for him to be active or stand in one place for more than a few minutes or sit in an unsupported chair. He did not want physical therapy as it hurt more than it helped. (Tr. 1266-67). A lumbar MRI showed mild to moderate central canal stenosis at L2-3. (Tr. 1336).

In February 2017 Plaintiff met with rheumatologist Dr. Vinay Reddy reporting pain at 8/10. He had hyperpigmentation change over his right lower extremity, a positive rheumatoid factor, was uncomfortable with the amount of pain he was in, had 3/5 strength to the left lower extremity, deep tendon reflexes were sluggish to the lower extremity and mildly antalgic gait on the left. (Tr. 873-74). Plaintiff met with neurologist Dr. Milena Stosic. Plaintiff reported worsening neck pain, cramping and tight left neck muscles, occasional radiating pain to the shoulders and some good days when the pain was better. There was a question of a rheumatological disease due to diffuse pain. Plaintiff had chronic pain issues and no improvement in back symptoms since his surgery. Sitting made his pain worse; walking or lying flat improved

the pain. It was noted chronic pain was not managed with oral medications and he had failed physical therapy. (Tr. 860-65, 1112-16). Gabapentin was increased and he did not feel well on the increased dose. (Tr. 1160, 1219). During this time he also received B12 injections. (Tr. 1193, 1197, 1199, 1210).

Plaintiff returned to Dr. Kaakaji who again observed poor range of motion to the neck and back, dorsiflexion was at 4/5, he had significant symptoms to the left with numbness, tingling and weakness. MRIs and CTs were ordered. (Tr. 1275-78). Dr. Kaakaji wrote to Dr. Kacmar explaining that Plaintiff had significant symptoms of left leg pain, with numbness, tingling and weakness into his left leg and left thigh and recurrent of pain in his neck. (Tr. 1388). A cervical MRI showed multilevel degenerative changes and moderate to severe right neural foraminal narrowing at C5-6. (Tr. 1339).

In May 2017  Dr. Kaakaji again observed, on examination, poor range of motion to the neck, tenderness to the lower back, Plaintiff was unable to heel and toe walk and had stiffness and leg weakness. MRIs and CTs were again reviewed. Dr. Kaakaji opined Plaintiff could have another surgery but there was no guarantee this would make life any better. He noted, "I do not expect him to be able to hold a job. He has not worked in over a year"…."even doing simple everyday activities is very difficult for him" "he is miserable. He is very limited. He is very disabled by back pain and neck pain". (Tr. 1284-86) "I am quite sympathetic with this man's problems, he is unable to work. He is in a lot of pain. He has not had significant improvement in his symptoms after surgery and here he is with adjacent segment degeneration, and he will probably require more surgery". (Tr. 1286). A cervical MRI showed multilevel degenerative change at C5-6 moderate to severe right and mild to moderate left foraminal stenosis. (Tr. 1340). Dr. Kaakaji continued to

8

treat Plaintiff, as did Dr. Kacmar, who noted that Plaintiff had an abnormal toe/heel walk on the left, wide based gait, positive straight leg raise and pain that kept him from walking or sitting more than 15-20 minutes at a time. (Tr. 1294-95, 1373-77). He was ambulating with use of a cane. (Tr. 1374).

Plaintiff continued to treat for varicose veins by sclerotherapy. (Tr. 1216). A lumbar MRI showed mild to moderate central canal stenosis at L2-3 (Tr. 1341) and a cervical MRI confirmed prior anterior C5-6 fusion and left foraminal stenosis at C7-T1. (Tr. 1342). Plaintiff had more tripping with the left leg which had less feeling. On examination, Plaintiff had poor range of motion with the neck and back, he got up slowly from the chair, had a slow and deliberate gait, his left quad had 3/5 weakness and he had a sensory deficit on the left. His pain was getting worse. (Tr. 1299, 1304, 1307). Plaintiff reported pain at 8/10. He had antalgic gait, positive bilateral lumbar facet pain, a chronic foot drop, atrophy of the gastrocnemius muscle group and recommendation was made for medial branch blocks, home therapy and Lyrica after meeting with pain management specialist, Dr. Samip Morker. (Tr. 1254-55).

In October 2017 Dr. Kacmar completed an RFC statement for Plaintiff.   He had treated Plaintiff since 2013. He found Plaintiff could not perform sedentary work, needed to use a cane for all surfaces, required periods of lying down, could use his hands, fingers, arms 25% of the day and fingers 20% for keyboarding, he could not walk one city block without severe pain, had problems with balancing, stooping, crouching and bending down, would miss more than five days of work per month and be off task over 30% of the day. (Tr. 907-911, 1256-59).

In March 2018 it was noted Plaintiff was being seen at the pain clinic, had received several injections which provided limited relief, and had tried, but could not afford, Lyrica. (Tr. 1363-67).

In May it was noted Lyrica had given Plaintiff side effects of paranoia and stiffness. (Tr. 1357).

In May 2018 Dr. Kaakaji also completed an RFC form for Plaintiff opining that Plaintiff could not perform sedentary work. Plaintiff required periods of lying down, frequent unscheduled breaks, he would miss five days of work per month and would be off task 30% of the workday. (Tr. 912-16). Plaintiff treated with Dr. Kaakaji the same day for increased lower back and neck pain with numbness into the hands and feet and weakness reported. (Tr. 1320). Plaintiff had poor range of motion to the lower extremities, stiff gait, difficulty getting on and off the exam table and was unable to do heel and toe walking as well as 3/5 weakness to hip flexion, reflex loss, sensory deficits especially to the left anterior thigh and loss of the left patellar reflex. He was frustrated and very limited by pain. It was noted he had tried injections, therapy and other treatments and nothing had provided relief. (Tr. 1321-22). A cervical MRI confirmed central stenosis most marked at the L2-3 level. (Tr. 1343, 1345). Dr. Kacmar listed Plaintiff as class five, severe limitation of functional activities and class three, able to engage only in limited stress situations and limited interpersonal relationships. He was not able to lift, pull, crawl and he did not anticipate a return to work due to severe pain with sitting or standing. (Tr. 1360-63).

Plaintiff continued to present as very stiff, with difficulty getting on and off an examination table and a chair, he had left-sided hip flexion quads and dorsiflexion weakness at 4/5, right sided dorsiflexion weakness 4+ out of 5 and his reflexes were blunted. (Tr. 1330). Again surgery was recommended but they discussed how there was no guarantee as to the outcome of the procedure. (R. 1330-31). In August 2018 Dr. Kacmar noted Plaintiff was in persistent neck and low back pain. He was considering surgery. On examination he had tenderness to the lumbar spine, decreased flexion, lateral bending, rotation, filament in the anterolateral thighs was

diminished. (Tr. 1350-52).

In support of remand, Plaintiff first argues that the ALJ erred in evaluating the opinion

evidence.  Agency regulations address the evaluation of opinion evidence for claims filed before

March 27, 2017.  20 C.F.R. § 404.1527. An ALJ must give a treating physician's opinion

controlling weight if "it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record." 20 C.F.R. § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 874, 874 n.1 (7th Cir.

2018). Moreover, the ALJ must give good reasons for the weight that it assigns a treating

physician's opinion. *Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013). "If an ALJ does not

give a treating physician's opinion controlling weight, the regulations require the ALJ to consider

the length, nature, and extent of the treatment relationship, frequency of examination, the

physician's specialty, the types of tests performed, and the consistency and supportability of the

physician's opinion." *Moss*, 555 F.3d at 561; 20 C.F.R. § 404.1527(c).

In her decision, the ALJ first addresses the January 2017 opinion of Dr. Kaakaji that

Plaintiff would be out of work from July 2016 through April 2017. The ALJ suggests that Dr.

Kaakaji found that Plaintiff would experience "fundamental or marked improvement within the

next 6-to-12 months". (Tr. 24, 1270) However, as Plaintiff points out,  Dr. Kaakaji stated that it

was "undetermined" when Plaintiff would be able to return to work. (Tr. 1270). After the January

2017 assessment, Plaintiff presented with a possible rheumatoid impairment (Tr. 873-74).  Plaintiff

met with neurologist Dr. Stosic who prescribed Gabapentin (Tr. 860-65, 1112-16, 1160, 1219).

Plaintiff presented with reduced deep tendon reflexes, at times antalgic gait, poor range of motion,

positive straight leg raise, his left quad had 3/5 weakness, he had a sensory deficit on the left, a

11

chronic foot drop, atrophy of the gastrocnemius muscle group, prescription of Lyrica and recommendation for additional surgery with no guarantee as to its success. (Tr. 873-74, 1254-55, 1275-78, 1284-86, 1294-95, 1299, 1304, 1307, 1321-22, 1330-31, 1357, 1363-67, 1373-77).

The ALJ also gave little weight to the May 2018 RFC statement prepared by Dr. Kaakaji for the following reasons: (1) Plaintiff was treated with ibuprofen rather than with narcotics; (2) Plaintiff declined surgical interventions; (3) a record showed that in March 2017 Plaintiff was in "no apparent distress", had good range of motion to the extremities, no gait, sensory, reflex or ataxia abnormalities; (4) the doctor's opinion was inconsistent with a record from August 2018 where Plaintiff's neck pain only "mildly" limited daily activities and lumbar pain was "moderate" and Plaintiff denied weakness, headaches, dizziness, fatigue or urinary symptoms; (5) in May 2018, Plaintiff was walking normally and in no acute distress with intact reflexes, decreased lumbar motion and in no acute distress; and (6) the determination of disability is an issue solely reserved to the Commissioner. (Tr. 24). Each of these items will be discussed below.

First, with respect to the use of ibuprofen, Plaintiff points out that he was administered a series of injections rather than given narcotics. (Tr. 325, 882-905). Also it appears that Plaintiff could not afford Lyrica (Tr. 1357, 1363-67), but had tried Gabapentin and Lyrica. (Tr. 860-65, 1112-16, 1160, 1219). Plaintiff further points out that prior to his onset date, he was on medications such as Percocet. (Tr. 325). The record shows that Plaintiff had been on stronger pain medications, then underwent surgery, yet continued to be in chronic pain, had side effects from Gabapentin and could not afford Lyrica.(Tr. 912). Also there is no mention in the record of any other type of treatment options Plaintiff could have pursued absent the risky surgeries. Thus, Plaintiff argues that the ALJ inappropriately "played doctor" by speculating that other more

12

aggressive treatment options were available for him. *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir.

2015). As previously noted, Plaintiff had undergone an anterior cervical discectomy and fusion at

C5-7 (Tr. 350, 474-94), a decompression surgery at L3-5 and discectomy and fusion (Tr. 529-61),

had failed physical therapy (Tr. 1160, 1219), had received sclerotherapy for varicose veins (Tr.

1216), recommendation was made for Lyrica (Tr. 1254-55, 1363-67), treated at pain management

and received several injections (Tr. 1363-67) with nothing providing relief. (Tr. 1321-22). Plaintiff

contends that the absence of recommendations for narcotics does not suggest that Plaintiff's

treatment was particularly conservative or that Dr. Kaakaji's opinions should be rejected. *Huber v.*

*Berryhill,* 732 Fed. Appx. 451, 456 (7th Cir. 2018).  This Court agrees with Plaintiff that the

record shows that he was not only treated with ibuprofen.

Second, with respect to Plaintiff's decision to not have further surgeries, Plaintiff reiterates

that Dr. Kaakaji opined that there was "no guarantee this will make life any better". (Tr. 1286,

1331). In fact, in addition to the recommended surgery, it "may ultimately be necessary to bring

him back to do a long fusion perhaps a thoracolumbar fusion". (Tr. 1331). Thus, Plaintiff argues

that, contrary to the ALJ's finding, there is no implication in the records that surgical interventions

"may improve his allegedly debilitating symptoms". (Tr. 24, 1331). The Commissioner argues that

Plaintiff's decision to decline surgery was a valid reason for the ALJ to reject Dr. Kaakaji's

opinion. However, the full statement by the doctor appears to suggest that even if Plaintiff had the

surgery, he would be unable to work. The statement was:

> He may benefit from further surgery to address both the appearance
> pseudoarthrosis, as well as extending the fusion and decompressing the spine at the
> adjacent segment. I have discussed with him that there is absolutely no guarantee
> that this will make his life any better. I do not expect him to be able to hold a job.
> He has not worked in over a year . He has applied for disability, and he says that

he has recognized at this point in time that there is no way he can return back to
working as he did before.

(Tr. 1286). Clearly, there was "no guarantee that this will make his life any better". (Tr. 1286).

The doctor also noted that "I discussed with them that there is certainly the possibility that he will

be worse off after the surgery". (Tr. 1286). This record makes clear that the surgery may not make

his life better and could worsen his symptoms.  Thus, the record clearly shows that Dr. Kaakaji

believed Plaintiff suffered from low back pain that warranted further treatment but noted that

surgery may not help and may worsen symptoms. This was further corroborated where Dr.

Kaakaji again addresses risks such as death, cardiopulmonary complications or further surgery.

    Third, with respect to the March 2017 record, Plaintiff presented with "poor range of

motion to the neck and back", he had trouble with the left foot dorsiflexion with heel walk (Tr.

1276), quad weakness  at 4/5 and a thigh sensory deficit. It was noted Plaintiff had significant

symptoms in his left leg with numbness, tingling and weakness to the left leg and thigh, some

recurrence of pain in the neck, spasms on his back on the right side and bending to pick up

anything heavy was very problematic. (Tr. 1277). As Plaintiff notes, this record fails to contradict

the findings of Dr. Kaakaji. As to being in "no acute distress" (Tr. 24), this is listed under "general

appearance". (Tr. 1276).  The records in this case do not provide an explanation for what the

doctor meant by "no acute distress".  Thus, it was inappropriate for the ALJ to assume that the

notations meant that Plaintiff did not experience limitations to the degree that he alleged. *Barnett*

*v. Berryhill*, 3:18-CV-072 JD, 2019 WL 1219544, at *5 (N.D. Ind. Mar. 15, 2019) citing

*Wanserski v. Colvin*, No. 1:14-CV-1033-DKL-JMS, 2015 WL 5692521, at *7 (S.D. Ind. Sept.

28, 2015) (noting that "acute" can refer to a disease, health effect, or symptom having a sudden,

abrupt onset and a short, but severe, course, as opposed to a chronic condition or symptom having

a slow development and a protracted but mild course; and, for physicians' purposes, "no acute

distress" can simply mean that a patient will probably not become unstable in the next five

minutes).

Fourth, with respect to the August 2018 record, while Plaintiff was on Lyrica for a period

of time, the pain was described as moderate to the lumbar spine and mild to the cervical spine and

exacerbated by activity (Tr. 24, 1363). However, by May, Plaintiff had returned to Dr. Kacmar

due to side effects with the medications, incapacitating chronic, sharp, stabbing, discomfort and

numbness.  (Tr. 1355). Plaintiff argues that an ALJ may not "cherry-pick" positive reports that

support a non-disability finding "while ignoring contradictory information."  *O'Connor-Spinner v.

Colvin*, 832 F.3d 690, 697-98 (7th Cir. 2016); *Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir.

2018) ("The ALJ considered only the signs of possible improvements in these notes and ignored

the negative findings.").

Fifth, as to the May 2018 record, while Dr. Kacmar noted, and the ALJ found, that

Plaintiff had a normal gait and intact reflexes, the record also shows that Plaintiff complained of

severe and incapacitating neck and back pain (Tr. 1355), had paresthesias (Tr. 1356), abnormal

heel and toe walking, tenderness to the lumbar spine and decreased flexion, lateral bending and

rotation. (Tr. 1357). Plaintiff was to follow up with his neurosurgeon. (Tr. 1357). Clearly, the ALJ

failed to take note of the full record.

Sixth, as to the determination that disability is an issue solely reserved to the Commissioner

(Tr. 24), the Seventh Circuit has rejected this argument over and over. *See e.g., Lambert*, 896

F.3d at 776 ("Whether a claimant qualifies for benefits is a question of law, but a medical opinion

that a claimant is unable to work is not an improper legal conclusion. Indeed, ALJs must consider medical opinions about a patient's ability to work full time because they are relevant to the RFC determination.") (internal citations omitted); *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013); *Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012) ("'[T]he final responsibility for deciding' residual functional capacity (ability to work—and so whether the applicant is disabled) 'is reserved to the Commissioner.' "). When Drs. Kaakaji and Kacmar opined that Plaintiff could not work, they were "not invading any prerogative reserved to the Social Security Administration." *Bjornson*, 671 F.3d at 648. Instead, "they supported those broader conclusions with the specific physical functional limitations they observed". *Muzzey v. Berryhill*, 3:17-CV-796 JD, 2019 WL 697137, at *5 (N.D. Ind. Feb. 20, 2019). Of course an ALJ is not bound by a doctors' broad conclusions that one cannot work, but here, both doctors provided medical assessments, not simply opinions on disability. *Id*. citing *Lambert*, 896 F.3d at 776.

In response, the Commissioner correctly argues that a physician's opinion on disability is due "no special significance". However, in the present case, the ALJ specifically indicated that the doctors' opinions that Plaintiff was disabled were rejected because a determination of disability is an issue reserved solely to the Commissioner. (Tr. 25). The two considerations are different. The Seventh Circuit has explained that although the "legal question whether a claimant qualifies for benefits is reserved," when determining a claimant's functioning an ALJ "must consider a treating physician's view that the severity of a claimant's impairments makes her unable to work." *Knapp v. Berryhill*, 741 Fed. Appx. 324, 327 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(e)(1)); *Kaehr v. Saul*, 3:19-CV-1171-PPS, 2021 WL 321450, at *5 (N.D. Ind. Feb. 1, 2021)(it is improper for the ALJ to outright dismiss Dr. Macellari's opinions simply because he stated, among many other

16

opinions, that Kaehr was not fit to work).

Instead of giving weight to Plaintiff's treating physicians' opinions, the ALJ gave "some weight" to the opinions of the Agency doctors. (Tr. 23). Plaintiff points out that the Agency doctors only provided projected RFCs. Their review was in January 2017 with the expectation that Plaintiff would improve by June 2017. (Tr. 140). The ALJ states that the Agency doctors' opinions were "generally consistent with the evidence at the time of their review". (Tr. 23). The ALJ's rationale is hard to follow because the Agency doctors presumably found Plaintiff could not work until June and this is actually consistent with the initial findings of Dr. Kaakaji. (Tr. 1270). The ALJ does not acknowledge this fact. (Tr. 23).

The Commissioner attempts to defend the ALJ's reliance on the Agency doctors' opinions. However, these doctors, as the ALJ notes, lacked critical records like updated MRIs, records and medical opinions of Drs. Kaakaji and Kacmar. (Tr. 23). The ALJ rejected the finding of Dr. Kaakaji, the only doctor who reviewed the MRI and offered an RFC assessment. In cases such as this, the Seventh Circuit does not hesitate to remand. *See e.g., Kemplen v. Saul*, 20-1651, 2021 WL 345751, at *3 (7th Cir. Feb. 2, 2021), an ALJ may not "play[ ] doctor and interpret new and potentially decisive medical evidence without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (internal quotation marks omitted); *see also Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018); *Akin v. Berryhill*, 887 F.3d 314, 317–18 (7th Cir. 2018); *Moreno v Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018). For the reasons discussed above, this Court finds that th ALJ erred in evaluating the opinion evidence. Thus, remand is required on this issue.

Next, Plaintiff argues that the ALJ erred in evaluating his subjective symptoms. An ALJ's evaluation of subjective symptoms will be upheld unless it is patently wrong. *Shideler v. Astrue*,

688 F.3d 306, 310-11 (7th Cir. 2012). Nevertheless, an ALJ must explain her evaluation with specific reasons that are supported by the record. *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013).

Under SSR 16-3, the ALJ first must determine whether the claimant has a medically determinable impairment that reasonably could be expected to produce his symptoms. SSR 16-3p. Then, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p. An individual's statements about the intensity and persistence of the pain may not be disregarded simply because they are not substantiated by objective medical evidence. SSR 16-3p. In determining the ability of the claimant to perform work-related activities, the ALJ must consider the entire case record, and the decision must contain specific reasons for the finding. SSR 16-3p. The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

> (i) The individual's daily activities;
> (ii) Location, duration, frequency, and intensity of pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) Type, dosage, effectiveness, and side effects of any medication;
> (v) Treatment, other than medication, for relief of pain or other symptoms;
> (vi) Other measures taken to relieve pain or other symptoms;
> (vii) Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

In the present case, the ALJ found that Plaintiff had reported weakness in his hand while swinging a hammer, which the ALJ ruled was inconsistent with Plaintiff's alleged debilitating fatigue. (Tr. 17). Plaintiff argues that the record shows that Plaintiff actually stated if he held a

hammer and tried to swing it, it would fall out of his hand. (Tr. 366, 504-07). Plaintiff contends

that this suggests that he could not even occasionally lift or carry 10 pounds, which is a

requirement of sedentary work. 20 C.F.R. §404.1567(a).

The ALJ next argues that Plaintiff was "quite functional" during physical therapy (Tr. 18).

However therapy records noted that Plaintiff had good and bad days.  He was able to tolerate

functional activities one day which involved box lifts with 12.5 pounds and push/pull of the sled

with 50 pounds but "he continues to have deficits with flexibility and extreme deficits noted over

the bilateral hamstrings. The patient has decreased dynamic balance and decreased core stability

noted with functional activities. He demonstrates gait deviations with decreased trunk and torsion

and decreased stride length". (Tr. 449). It was noted Plaintiff had functional deficits with

lift/carrying a laundry basket, vacuum/sweeping the floor, lift/carrying groceries into the house,

ambulation across uneven surfaces, picking up items off the floor, transferring in/out of the car,

grooming/self-care, ascending/descending stairs in his home, completing grocery shopping, yard

maintenance or getting up from a chair. (Tr. 448). His back index score was 76, which equates to

"crippling back pain". (Tr. 448).

The ALJ also disputes the neurosurgeon's impression of the MRI and objective testing and

deferred to the radiologist interpretation of the MRI. Plaintiff argues that the ALJ "played doctor"

by substituting her own opinion of the MRI results for that of a treating specialist. In *Israel v.

Colvin*, 840 F.3d 432, 439 (7th Cir. 2016), the Seventh Circuit remanded the case as the ALJ

interpreted the MRI findings all on her own. While, here, the ALJ deferred to the radiologist's

interpretation rather than interpreting the findings all on her own, she is still "playing doctor" by

deciding which interpretation is correct.  When faced with such a decision, the ALJ should, at a

19

minimum, apply the § 404.1527 factors and, arguably, should obtain a medical expert to evaluate the competing interpretations.

Plaintiff points out that the ALJ did not mention why testimony as to pain and daily activities was rejected. Rather, the ALJ afforded little weight to the opinion of Plaintiff's wife. While her testimony corroborated Plaintiff's the ALJ stated that she was not a specialist in medicine. Yet, nothing in 20 C.F.R. §404.1527(f) or SSR 06-3p require third-party evidence be from specialists. According to SSR 06-3p, while "other sources" cannot establish the existence of a medically determinable impairment, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function. SSR 06-3p. *Dogan v. Astrue*, 751 F. Supp 2d 1029, 1038 (N.D. Ind. 2010).

Plaintiff points out that the ALJ did not analyze "other evidence," including Plaintiff's testimony regarding his subjective complaints of pain and limited activities of daily living in addition to the objective medical evidence. *See* § 404.1529(c)(3). Plaintiff notes that pain alone can be disabling without objective medical evidence to support it. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (2014); *Carradine v. Barnhart*, 360 F.3d 751, 753 (2004). Here, there is objective evidence by way of MRIs, X-rays, two treating opinions, positive straight leg raises, decreased reflexes, a foot drop, and reduced strength. Clearly, the ALJ's analysis of Plaintiff's subjective symptoms is patently wrong as the ALJ failed to explain her evaluation of the above points with specific reasons that are supported in the record.  Thus remand is required.

Next, Plaintiff argues that the ALJ erred in evaluating the possibility of Listing 1.04 equivalency.  If a claimant has an impairment that meets or equals an impairment found in the

Listing of Impairments, a claimant is presumptively eligible for benefits. 20 C.F.R. § 404.1520(d).
"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must
discuss the listing by name and offer more than perfunctory analysis of the listing." *Barnett v.
Barnhart,* 381 F.3d 664, 668 (7th Cir.2004). The Listings specify the criteria for qualifying
impairments. *Id.* (citing 20 C.F.R. § 404.1525(a)). A claimant may also satisfy a Listing by
showing that his impairment is accompanied by symptoms that are equal in severity to those
described in the Listing. 20 C.F.R. § 404.1526. A finding of medical equivalence requires an
expert's opinion on the issue. *Barnett*, 381 F.3d at 670. The musculoskeletal Listings include pain
or other symptoms among their criteria, and it is important to evaluate such symptoms to
determine their impact on the claimant's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §
1.00(B)(2)(d).

Listing 1.04 describes spinal disorders (including herniated nucleus pulposus, spinal
arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, and vertebral fractures),
resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root
compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. 20
C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. It also requires, in relevant part: "Evidence of nerve root
compression characterized by neuro-anatomic distribution of pain, limitation of motion of the
spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by
sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising
test." *Id*.

Plaintiff acknowledges that the ALJ did a Listing analysis. However Plaintiff contends that
the ALJ's analysis did not include opinion support.  Plaintiff argues that the ALJ ignored

21

significant evidence in this case. For example, later in the Decision the ALJ acknowledges MRIs
showed moderate to severe findings at both the cervical and lumbar spine. (Tr. 23). This is
relevant as to meet the Listing, only one disc needs to be impacted; here, Plaintiff suffers thoracic,
lumbar and cervical issues with moderate to marked issues to the cervical and lumbar spine. (Tr.
1340, 1343, 1345).

      Plaintiff also points out that the ALJ makes no mention of the abnormal deficits that do
support the Listing such as:  3/5 strength to the left lower extremity, deep tendon reflexes were
sluggish to the lower extremity and mildly antalgic gait on the left, (Tr. 873-74), poor range of
motion to the neck and back, dorsiflexion was at 4/5, he had significant symptoms to the left with
numbness, tingling and weakness (Tr. 1275-78), abnormal toe/heel walk on the left, wide based
gait, positive straight leg raise and pain (Tr. 1294-95, 1373-77), slow and deliberate gait, his left
quad had 3/5 weakness, he had a sensory deficit on the left (Tr. 1299, 1304, 1307), antalgic gait,
positive bilateral lumbar facet pain, a chronic foot drop and atrophy of the gastrocnemius muscle
group (Tr. 1254-55), poor range of motion to the lower extremities, stiff gait, difficulty getting on
and off the exam table and was unable to do heel and toe walking as well as 3/5 weakness to hip
flexion, reflex loss, sensory deficits especially to the left anterior thigh and loss of the left patellar
reflex (Tr. 1321-22), difficulty getting on and off an examination table and a chair, he had
left-sided hip flexion quads and dorsiflexion weakness at 4/5, right sided dorsiflexion weakness 4+
out of 5 and his reflexes were blunted, (Tr. 1330) and tenderness to the lumbar spine, decreased
flexion, lateral bending, rotation, filament in the anterolateral thighs was diminished. (Tr.
1350-52). Plaintiff argues that an analysis should have been performed to determine if his
condition was equivalent to Listing 1.04.

In response, the Commissioner notes that the evidence cited by Plaintiff was mentioned in the ALJ's decision. The ALJ specifically found that there was no evidence of nerve compression, motor loss or reflex loss and positive leg raising both sitting and supine. (Tr. 15). Yet the MRI did show moderate to severe disc herniation to more than one area of the spine (Tr. 1340, 1343, 1345) coupled with evidence of reflex loss (Tr. 873-74, 1321-22, 1350-52) and positive straight leg raise in both positions. (Tr. 1294-95, 1373-77). Additionally, there was evidence of abnormal gait, weakness and range of motion loss.  Thus, Plaintiff concludes that he satisfies the elements required of the Listing with the exception of specificity as to the straight leg raise, as well as herniations at more than one level of the spine (with the Listing only requiring one), thus satisfying the standard that the findings be equal in severity to the criteria in the Listing.

Due to Plaintiff's extensive medical records showing severe findings regarding his spine disorders, which do not appear to have been analyzed by the ALJ with respect to his condition possibly being medically equal to Listing 1.04, remand is warranted.

<u>Conclusion</u>

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED for further proceedings consistent with this Opinion and Order.

Entered: February 26, 2021.

s/ William C.  Lee
William C. Lee, Judge
United States District Court